UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NORMAN HEINZE, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 4:17-cv-03029 |
| Plaintiff, | § § | JURY TRIAL DEMAND |
| v. | § § | |
| TESCO CORPORATION, MICHAEL W. SUTHERLIN, FERNANDO R. ASSING, JOHN P. DIELWART, R. VANCE MILLIGAN, DOUGLAS R. RAMSAY, ROSE M. ROBESON, and ELIJIO V. SERRANO, | § § § § § § § | |
| Defendants. | § § | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Norman Heinze ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Tesco Corporation ("Tesco" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Tesco, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between

Tesco, Nabors Industries Ltd ("Parent"), and Nabors Maple Acquisition Ltd. ("Merger Sub," and together with Parent, "Nabors").

2.      On August 13, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 0.68 of a common share of Nabors for each share of Tesco common stock they own (the "Merger Consideration").

3.      On September 18, 2017, the Board authorized the filing of a materially incomplete and misleading Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Company's financial advisor, J.P. Morgan Securities LLC, ("J.P. Morgan"), in support of its fairness opinion.

6.      The special meeting of Tesco shareholders to vote on the Proposed Merger is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and

Regulation G, 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Tesco shareholders, or, in the event that the Proposed Merger is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant, either, because Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Tesco maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is and, at all relevant times, has been a Tesco shareholder.

12.     Defendant Tesco is a Canadian corporation and maintains its headquarters at 11330 Clay Road, Suite 350, Houston, Texas, 77041.  Tesco is a global leader in the design, manufacture and service of technology based solutions for the upstream energy industry. Tesco's common stock trades on the NASDAQ under the ticker symbol "TESO."

13.     Individual Defendant Michael W. Sutherlin is a director of Tesco and is the Chairman of the Board.

14.     Individual Defendant Fernando R. Assing is a director of Tesco and is the President and Chief Executive Officer of the Company.

15.     Individual Defendant John P. Dielwart is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant R. Vance Milligan is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Douglas R. Ramsay is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Rose M. Robeson is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Elijio V. Serrano is, and has been at all relevant times, a director of the Company.

20.     The parties identified in paragraph 12 through 19 are collectively referred to as Defendants.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Tesco (the "Class").  Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of July 31, 2017, there were approximately 46,754,956 shares of Tesco common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Tesco will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      Background and the Proposed Transaction

23.      Tesco was organized under the laws of Alberta, Canada, on December 1, 1993, through the amalgamation of Shelter Oil and Gas Ltd., Coexco Petroleum Inc., Forewest Industries Ltd., and Tesco Corporation.   TESCO is a global leader and provider of highly engineered technology-based solutions for drilling, servicing, and completion of wells for the upstream energy industry.   TESCO seeks to improve the way wells are drilled by delivering safer and more efficient solutions that add value by reducing the costs of drilling for, and producing, oil and natural gas.   TESCO's operations consist of top drives and automated pipe handling equipment sales and rentals; aftermarket sales and services; and tubular services, including related products and accessories sales.

24.     Nabors owns and operates the world's largest land-based drilling rig fleet and is a leading provider of offshore platform drilling rigs in the U.S. and multiple international markets. Nabors also provides advanced wellbore placement services, drilling software and performance tools, drilling equipment and innovative technologies throughout the world's most significant oil and gas markets.   In today's performance-driven environment, Nabors believes it is well positioned to seamlessly integrate downhole hardware, surface equipment, and software solutions into its AC rig designs.   Leveraging its advanced drilling automation capabilities, Nabors believes its highly skilled workforce continues to set new standards for operational excellence and transform the industry.

25.     On August 14, 2017, Tesco issued a press release announcing the Proposed Transaction.  The press release stated in relevant part:

> HOUSTON — Tesco Corporation ("TESCO" or the "Company") (NASDAQ: TESO) today announced that it has entered in to an Arrangement Agreement ("Agreement") with Nabors Industries Ltd. ("Nabors") (NYSE: NBR) to combine with Nabors in a stock-for-stock transaction. TESCO shareholders will be issued 0.68 common shares of Nabors for each outstanding share of common stock of TESCO. Upon consummation of this transaction, TESCO shareholders will own approximately 10% of the outstanding shares of Nabors. The transaction has been approved by the board of directors of both companies and is subject to approval by TESCO security holders and satisfaction of customary closing conditions and regulatory approvals, including court approval required by Section 3(a)(10) of the Securities Act of 1933, as amended.
>
> This transaction values TESCO common stock at $4.62 per share based on Nabors closing share price of $6.80 on the New York Stock Exchange on August 11, 2017. This represents a premium of 19% to TESCO's closing price on the NASDAQ Stock Market on the same date, and represents a premium of 30% to TESCO's enterprise value based on TESCO's June 30, 2017 cash balance.
>
> Michael W. Sutherlin, TESCO's Non-Executive Chairman of the Board said "With this transaction, TESCO will now have an expanded platform, which will allow for acceleration of its strategy and increase the potential

for market share gains around key industry trends. The combination will provide significant value to TESCO shareholders by participating in a stronger and broader offering of complementary rig equipment product lines and tubular services."

"The addition of TESCO to our company represents another step forward for both our rig equipment and Nabors Drilling Solutions business. TESCO is respected for the quality of their product offerings and aftermarket service levels. I am eager to realize the benefits to our combined customers and shareholder groups that this combination will provide," said Nabors' Chairman, President and Chief Executive Officer Anthony G. Petrello.

Fernando Assing, TESCO's President and Chief Executive Officer, commented, "This is a very exciting opportunity to combine two world class companies that are highly focused on delivering best in class services to the oil and gas industry. This combination will further reinforce Nabors position as a leading rig equipment and drilling automation provider by integrating TESCO's advanced tubular services technology and products into the Nabors global rig footprint and NDS services. The new expanded platform also creates significant career opportunities for TESCO's employees as part of a much larger international organization."

## II.    The Merger Consideration Fails to Fairly Compensate Tesco Shareholders

26.    The Merger Consideration is inadequate given Tesco's recent financial performance and strong growth prospects.  On August 14, 2017, Nabors' stock price was trading at $6.64.  Based on the 0.68 exchange ratio, this placed the value of the Merger Consideration at $4.52.   The agreed upon Merger Consideration represented a marginal premium to Tesco's August 14 trading price of $4.40 and a 53% *discount* to Tesco's 52-week high trading price of $9.65.

27.    Most recently, on August 8, 2017, the Company reported positive financial results for the 2017 Second Quarter. Revenue, Adjusted EBITDA, and GAAP net income (loss) all improved both on the quarter and year-over-year.  Tesco reported revenue of $40.1 million in the second quarter of 2017, up from $36.7 million, or 9%, in the first quarter of 2017, and up from $33.6 million, or 19%, in the second quarter of 2016.  CEO Fernando Assing announced:

Our business continues to improve and the second quarter results reflect the benefit of the stronger U.S. land market and growing CDS sales as customers continue to recognize the benefits of drilling automation. Despite some new product shipping delays to the third quarter, revenue and EBITDA both improved sequentially.

During the second quarter, we continued to experience growth and improved profitability from several key initiatives, primarily CDS™ Evolution adoption and CDS sales. Customer interest in automated land tubular service offerings continues to increase and is expected to accelerate as our cementing accessories are deployed.

As market uncertainty and pricing pressure increases in a lower-for-longer environment, it will be more important to continue to gain market share through technology deployments. As we look ahead to the third and fourth quarters, we see opportunities that have the potential to generate revenue and EBITDA improvements while keeping cash levels near current levels. The approximate $8.4 million invested in working capital and capital expenditures in the first half of 2017 positions us to continue to grow revenue in the second half of 2017 and to get closer to our goal of reaching breakeven EBITDA.

Tesco has invested in and remains well positioned in key international markets and sustained international activity and market share gains will be key to offset any potential North America market slow down. We continue to benefit from our strong balance sheet and will continue to pursue additional opportunities to invest our cash to fund growth and incremental profitability to outperform the market.

28.     Finally, J.P. Morgan valued the Company at a significantly higher price than the Merger Consideration.  J.P. Morgan calculated an implied equity value per share of up to $5.75, a substantial premium to the Merger Consideration.

29.     In sum, the Merger Consideration appears to inadequately compensate Tesco shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that the exchange ratio is not fair compensation for Tesco shareholders.  It is, therefore, imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for

shareholders to properly exercise their corporate suffrage rights and make an informed decision

concerning whether to vote in favor of the Proposed Merger.

### III.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers

30.    In addition to failing to conduct a fair and reasonable sales process, the Individual

Defendants agreed to certain deal protection provisions in the Merger Agreement that operate

conjunctively to deter other suitors from submitting a superior offer for Tesco.

31.    First, the Merger Agreement contains a no solicitation provision that prohibits the

Company or the Individual Defendants from taking any affirmative action to obtain a better deal

for Tesco shareholders.   The Merger Agreement states that the Company and the Individual

Defendants shall not:

> (i) initiate, solicit, knowingly encourage or knowingly facilitate any
> inquiries regarding, or the making of any proposal or offer relating to,
> any transaction (other than any the transaction permitted or contemplated
> by this Agreement) to effect (A) a merger, reorganization, share
> exchange, consolidation, business combination, recapitalization,
> liquidation, dissolution or similar transaction involving it or any of its
> Subsidiaries whose assets, taken together, constitute 15% or more of the
> consolidated assets (including stock of its Subsidiaries) of the Company
> and its Subsidiaries, taken as a whole, based on fair market value, (B) any
> direct or indirect sale of, or tender or exchange offer for, the Company's
> voting securities, in one or a series of related transactions, that, if
> consummated, would result in any Person (or the shareholders of such
> Person) beneficially owning securities representing 15% or more of the
> Company's total voting power (or of the surviving parent entity in such
> transaction) or (C) any direct or indirect sale, lease, exchange, mortgage,
> pledge, license, transfer or other disposition, directly or indirectly, by
> merger, consolidation, sale of equity interests, share exchange, joint
> venture, business combination or otherwise, in one or a series of related
> transactions, of assets or businesses of the Company or its Subsidiaries
> constituting 15% or more of the consolidated assets or revenues of the
> Company and its Subsidiaries, taken as a whole (any such proposal, offer
> or transaction (other than a proposal or offer made referred to as an by
> Parent or an affiliate thereof) being hereinafter "*Acquisition Proposal*"),
> (ii) have any discussions with or provide any confidential information or
> data relating to the Company or any of its Subsidiaries to any Person
> relating to an Acquisition Proposal, or engage in any negotiations

concerning an Acquisition Proposal or (iii) approve, recommend, execute or enter into, or propose to approve, recommend, execute or enter into, any letter of intent, agreement in principle, merger agreement, asset purchase or share exchange agreement, option agreement or other agreement related to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement entered into pursuant to Section 5.3(b)(i)) or propose or agree to do any of the foregoing.

32.     Additionally, the Merger Agreement grants Nabors recurring and unlimited matching rights, which provides Nabors with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Tesco, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

33.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Nabors can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Nabors, to the detriment of Tesco's public shareholders.

34.     Lastly, the Merger Agreement provides that Tesco must pay Nabors a termination fee of $8,000,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Tesco shareholders with a superior offer.

35.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

36.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Tesco's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## IV.    The Proxy Is Materially Incomplete and Misleading

37.     On September 18, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

38.     First, the Proxy fails to disclose Tesco's unlevered free cash flow projections[1] for the *Base Case* and the *Growth Case* projections for 2017-2022.  See Proxy 42-43.  These unlevered free cash flows are material to the Company's shareholders.  Indeed, J.P. Morgan specifically utilized unlevered free cashflows in their discounted cash flow valuation.  Investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation.  Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the Tesco's expected unlevered free

---

[1]  Unlevered free cash flows are used to determine a company's enterprise value.  The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall.  For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

cash flows?  Without unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

39.     EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.   EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3]  As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the unlevered free cash flow projections are material and their omission renders the projections included in the Proxy misleading.

40.     The omission of all the above-referenced projections renders the financial projections included on pages 42-43 of the Proxy materially incomplete and misleading.  If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft

---

[2]  Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3]  Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

41.     Further, the Proxy fails to provide material information concerning the Company's included financial projections.  Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

42.     When a company discloses non-GAAP financial measures in a Proxy, it must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

43.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Tesco has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal,

recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[4]

44.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[5]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[6]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

45.     In order to make the projections included on pages 41-42 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

46.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including EBITDA

---

[4]  Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[5]  *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]  *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

(EBITDA is defined as earnings before interest, taxes, depreciation and amortization for Tesco, but earnings before interest, taxes, depreciation, and amortization, excluding non-recurring integration, severance, and retention expenses for Nabors).  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.

47.    Tesco regularly performs non-GAAP reconciliations in their financial results press releases disseminated to shareholders and the market.  In fact, the Company specifically performed line item GAAP reconciliations for EBITDA and Free Cash Flows in their most recent earnings announcement:

**TESCO CORPORATION**

**Non-GAAP Measure - Adjusted EBITDA [1]**

*(in millions)*

| | Three Months Ended June 30, | | Three Months Ended March 31, | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2017 | 2016 |
| Net loss under U.S. GAAP | $ (12.1 ) | $ (18.9 ) | $ (13.7 ) | $ (25.8 ) | $ (75.7 ) |
| Income tax expense (benefit) | 0.4 | (0.2 ) | 1.0 | 1.4 | 0.3 |
| Depreciation and amortization | 5.8 | 7.2 | 6.0 | 11.8 | 15.2 |
| Interest expense | — | 0.2 | 0.1 | 0.1 | 0.7 |
| Stock compensation expense-non-cash | 1.5 | 1.0 | 1.2 | 2.7 | 2.1 |
| Severance & restructuring charges | 0.5 | 2.9 | 0.7 | 1.2 | 5.9 |
| Bad debt from certain accounts | (0.4 ) | — | — | (0.4 ) | 0.3 |
| Foreign exchange loss (gain) | 0.4 | — | (0.1 ) | 0.3 | 1.2 |
| Asset sale reserves | — | (0.7 ) | — | — | (3.0 ) |
| Warranty & legal reserves | — | 0.7 | 0.1 | 0.1 | 0.7 |
| Inventory reserves | — | 0.2 | — | — | 1.3 |
| Long-lived asset impairments | — | — | — | — | 35.5 |
| Credit facility costs | — | 0.1 | — | — | 0.3 |
| Adjusted EBITDA | $ (3.9 ) | $ (7.5 ) | $ (4.7 ) | $ (8.6 ) | $ (15.2 ) |

TESCO CORPORATION

Non-GAAP Measure - Free Cash Flow[4]

*(in millions)*

|  | Three Months Ended June 30, 2017 | | Three Months Ended March 31, 2017 | | Six Months Ended June 30, 2017 | |
|---|---|---|---|---|---|---|
| Net cash used in operating activities | $ | (11.5 ) | $ | (8.9 ) | $ | (20.4 ) |
| Capital expenditures | | (0.8 ) | | (0.7 ) | | (1.5 ) |
| Proceeds on asset sales | | 1.8 | | 0.4 | | 2.2 |
| Free cash flow | | (10.5 ) | | (9.2 ) | | (19.7 ) |
| Severance & restructuring payments | | (0.3 ) | | (1.1 ) | | (1.4 ) |
| Adjusted free cash flow | $ | (10.2 ) | $ | (8.1 ) | $ | (18.3 ) |

48.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 11.5% to 14.5%; (ii) the inputs and assumptions underlying the calculation of the perpetual growth rate range of 0.0% to 2.0%; and (iii) the actual range of terminal values calculated and utilized in the Analysis.

49.     These key inputs are material to Tesco shareholders, and their omission renders the summary of J.P. Morgan's Discounted Cash Flow Analysis on page 47 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions

of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

50.     With respect to the J.P. Morgan's *Public Trading Multiples* Analysis, the Proxy fails to disclose the individual multiples that J.P. Morgan calculated for each company utilized. The omission of these multiples renders the summary of this analysis and the implied equity value reference range materially misleading. A fair summary of a Companies Analysis requires the disclosure of the individual multiples for each company; even providing the range that a banker applied would be insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

51.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act, Rule 14a-9, and 17 C.F.R. § 244.100 Promulgated Thereunder**

52.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

54.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

55.   SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure … not misleading."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17

C.F.R. § 244.100(a).   As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

56.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each Defendant reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by J.P. Morgan in support of its fairness opinion.

58.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each Individual Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

59.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided

by J.P. Morgan as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

60.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review J.P. Morgan's analyses in connection with their receipt of the fairness opinion, question J.P. Morgan as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

61.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

62.     Tesco is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

63.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

64.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Tesco within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Tesco, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were, thus, directly involved in preparing this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

72.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 10, 2017.

                                        Respectfully submitted,


                                        _____/s/ Thomas E. Bilek_____
                                        Thomas E. Bilek
                                        TX Bar No. 02313525 / SDTX Bar No. 9338
                                        **THE BILEK LAW FIRM, L.L.P.**
                                        700 Louisiana, Suite 3950
                                        Houston, TX  77002
                                        (713) 227-7720

                                        *Attorneys for Plaintiff*


**OF COUNSEL:**

Juan E. Monteverde
**MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, Suite 4405
New York, NY  10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com